## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

PUERTO RICO PRIVACY ASSOCIATION, INC.; THE VIVEAPTO TRUST; and PILAR FIDUCIARY SERVICES LLC,

      *Plaintiffs*

      v.

UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as the Secretary of the United States Department of the Treasury; THE FINANCIAL CRIMES ENFORCEMENT NETWORK; and ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network,

      *Defendants*.

No. 3:26-cv-1111

Injunctive and Declaratory Relief Requested

## COMPLAINT

1.    Plaintiffs the Puerto Rico Privacy Association, Inc. (the "Association"), the ViveApto Trust (the "Trust"), and Pilar Fiduciary Services LLC (the "Trustee") (collectively, "Plaintiffs") bring this civil action seeking declaratory and injunctive relief and vacatur against Defendants the United States Department of the Treasury (the "Treasury"); Scott Bessent, in his official capacity as the Secretary of the Treasury; the Financial Crimes Enforcement Network ("FinCEN"); and Andrea Gacki, in her official capacity as Director of FinCEN (collectively, "Defendants"), and allege as follows.

## NATURE OF THE ACTION

2.    This action challenges a sweeping new rule issued by FinCEN, a bureau within the Treasury: the Anti-Money Laundering Regulations for Residential Real Estate Transfers (the

"Rule"), 89 Fed. Reg. 70,258 (Aug. 29, 2024) (codified at 31 C.F.R. ch. X). The Rule will take effect on March 1, 2026.

3.      The Rule is unbounded and unprecedented. The Rule imposes novel reporting obligations for an entire category of "non-financed transfers of residential real property to" a wide array of "legal entities and trusts on a nationwide basis." 89 Fed. Reg. at 12,424. In other words, the Rule will apply to transfers nationwide simply because the transacting parties chose to engage in a non-financed transaction (e.g., a transaction not involving a mortgage) that transfers real estate to a trust or certain other legal entities (e.g., a limited liability company). For these covered transactions, the Rule strips away traditional privacy protections, requiring parties to disclose the "beneficial owners" of "entities and trusts." 89 Fed. Reg. 12,424.

4.      Millions of perfectly lawful transactions will be swept up by the Rule and subject to FinCEN's scrutiny. Under FinCEN's own estimate, the Rule may apply to 850,000 transactions each year. This is a massive increase from FinCEN's predecessor rule, which was limited to a small subset of transactions in only some geographic areas, and applied only to about 20,000 transactions a year.[1]

5.      By demanding wide-ranging and intrusive disclosures, the Rule will trample the privacy interests of parties involved in routine residential real estate transactions. And the Rule's onerous reporting requirements impose substantial burdens on reporting persons who must comply with the Rule's far-reaching dictates.

6.      The Rule imposes these draconian reporting requirements even though there is nothing inherently suspicious about purchasing property without taking out a loan. There are many

---

[1] Notice by FinCEN, *Agency Information Collection Activities: Proposed Renewal: Comment Request; Renewal without Change of Bank Secrecy Act Regulations Requiring Reports of Certain Domestic Transactions*, n.9 (Feb. 23, 2024).

legitimate reasons for parties to avoid financing, including—most obviously—the opportunity to save hundreds of thousands of dollars (or more) in lending costs and interest payments. By the same token, there are many innocuous reasons for purchasing real estate through a trust or entity that shields beneficial ownership. A party may structure a transaction in an attempt to limit liability, further a broader investment strategy, promote tax planning, or maintain privacy for the sake of personal safety.

7.      On that last note, the Rule massively intrudes on the privacy rights of individuals and entities. Aside from some limited exceptions, the Rule requires reporting persons to disclose identifying information of all persons and entities involved in the covered transactions. With the advent of the Rule, FinCEN—for the first time—requires disclosure of the beneficial owners of the legal entities and trusts involved in the transactions. In some cases, this even requires parties to report the identities of minor children. 89 Fed. Reg. 70,274.

8.      The Rule effectively requires individuals and entities to disclose their private information to reporting persons, even though Congress has not subjected those individuals and entities to FinCEN regulation.

9.      The Rule's privacy invasions will cause severe harm. By collecting this highly sensitive information, the Rule puts a bullseye on beneficial owners, jeopardizing their safety. Almost inevitably, the Rule will make this risk a reality. The Rule sweeps in many different persons and entities involved in real estate transactions, requiring these settlement actors to collect and retain otherwise confidential beneficial ownership information ("BOI") for five years. Many of these persons and entities are not well equipped to safeguard this BOI; they are soft targets, vulnerable to hacking and data breaches that would expose this information. Indeed, in recent years, threat actors successfully have hacked government agencies, exposing sensitive data on tens

of millions of people. There is no reason to think that FinCEN would be immune to similar attacks. If anything, FinCEN would be an even more attractive target, given the very sensitivity of the BOI collected under the Rule. Worse yet, the Rule creates tens of thousands of additional targets by dragooning countless settlement actors into FinCEN's reporting regime. Those settlement actors will be bombarded with similar attacks, and with less sophisticated technological protections, they will be even more vulnerable to threat actors. The bottom line is that this sensitive BOI will not remain secure. And once this information is leaked, individuals will be subject to all the risks that follow such data breaches—doxxing, extortion, identity theft, and even physical harm. Simply put, the Rule collects (but cannot protect) highly sensitive information, and that information will function as a Rosetta Stone for targeted identification.

10.     The Rule's onerous reporting regime imposes a particularly pronounced burden on Puerto Rico persons and entities subject to the Rule. Since 2012, Puerto Rico law has offered substantial tax incentives for investors to relocate to Puerto Rico, subject to residency and philanthropic conditions. Some investors may be interested in obtaining real estate through entities or trusts so as to maintain privacy, safety, and anonymity, including by shielding disclosure of BOI, particularly given that Puerto Rico's tax-incentive initiative has attracted unfounded attacks targeting outside investment and even the investors themselves. The Rule will strip away those important protections. And Puerto Rico law and regulations already enable some forms of identity mapping, making the Rule's privacy invasions particularly damaging.

11.     Given its overreaching and blunderbuss approach, the Rule unsurprisingly suffers from a host of significant legal defects.

12.     **The Rule lacks statutory authority**. FinCEN premises the Rule on the Bank Secrecy Act of 1970 ("BSA"). 31 U.S.C. §§ 5311–30. But the BSA authorizes FinCEN to impose

reporting obligations only as to "suspicious transaction[s] relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). The Rule violates that restriction. The Rule does not identify any specific indicia of suspicious activity. Instead, it imposes blanket reporting obligations on an entire category of transactions, baselessly treating them as inherently "suspicious" and "relevant to a possible violation of law." *See id*. FinCEN vaguely asserts that such real estate "transfers can be and have been exploited by illicit actors." 89 Fed. Reg. 70,259. But the mere fact that a type of transaction "can be" used by "illicit actors" does not render the entire category of transactions suspicious. Similarly, the Rule departs from the statutory limitations that apply to a streamlined Suspicious Activity Report ("SAR"). By statute, these streamlined SARs may be required only for "suspicious transactions relevant to potential violations of law." 31 U.S.C. § 5318(g)(5)(D)(ii)(I). The Rule ignores these limitations, opting instead for a broad-brush approach.

13.    **The Rule violates the Fourth Amendment**. The Rule calls for collecting private information without any articulable suspicion or connection to illegal activity. This violates the Fourth Amendment's prohibition of unreasonable searches without a warrant. The Rule amounts to an illegal general warrant: It indiscriminately requires reporting persons to turn over private information about transactions for criminal-investigation purposes without the government first obtaining judicial review as to whether there exists any articulable suspicion or connection to illegal activity. By conscripting local brokers, settlement agents, attorney-notaries, and similar custodians to harvest, warehouse (often for years), and transmit sensitive ownership data without individualized suspicion or judicial oversight, the Rule foreshadows a regime where any private transaction may be scrutinized at will. The Constitution does not permit warrantless, suspicionless surveillance of citizens, their counterparties, and the small businesses that serve them simply

because some transactions could be misused by "illicit actors."

14.     In light of these serious defects, Plaintiffs respectfully request that the Court: (a) hold the Rule unlawful and vacate and set aside FinCEN's agency action; (b) declare the Rule unlawful and unenforceable; (c) enjoin the Rule's enforcement as to Plaintiffs; and (d) grant Plaintiffs any other relief that they are entitled to in this action.

**PARTIES**

15.     Plaintiff the Puerto Rico Privacy Association, Inc. (the "Association," as previously defined) is a corporation organized under the laws of the Commonwealth of Puerto Rico with its principal place of business in Puerto Rico.

16.     Plaintiff ViveApto Trust (the "Trust," as previously defined) is a trust formed under the laws of the Commonwealth of Puerto Rico.

17.     Plaintiff Pilar Fiduciary Services LLC (the "Trustee," as previously defined) is a limited liability company organized under the laws of the Commonwealth of Puerto Rico.

18.     The Trustee and its beneficiary are Puerto Rico residents. The Trust (as well as its Trustee and beneficiary) are members of the Association.

19.     Defendant the United States Department of the Treasury (the "Treasury," as previously defined) is an executive-branch department of the federal government headquartered in Washington, D.C. The Treasury is responsible for administering and enforcing the BSA, the statute on which FinCEN purports to base the Rule.

20.     Defendant Scott Bessent is the Secretary of the Treasury and is named as a party in his official capacity.

21.     Defendant the Financial Crimes Enforcement Network ("FinCEN," as previously defined) is a bureau within the Treasury. FinCEN is an "agency" of the United States within the meaning of 28 U.S.C. § 451.

22.     Defendant Andrea Gacki is the Director of FinCEN and is named as a party in her official capacity.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1346 because this action arises under the Constitution and laws of the United States and is brought against the United States. This Court has subject-matter jurisdiction under 5 U.S.C. §§ 701–06 because this action challenges a final agency action on grounds set forth in 5 U.S.C. § 706(2).

24.     The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02, 28 U.S.C. § 1361, and to vacate unlawful agency action under 5 U.S.C. § 706.

25.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

26.     Venue also is proper under 28 U.S.C. § 1391(e)(1)(B) because Defendants are officers, employees, and agencies of the United States and a substantial part of the events or omissions giving rise to the claims occurred in this District. To the extent that property "is the subject of the action," venue also is proper in this District because a substantial part of any such property is situated here. 28 U.S.C. § 1391(e)(1)(B). To the extent that no real property is involved, venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Defendants are officers, employees, and agencies of the United States and Plaintiffs reside in this district. *See also* 5 U.S.C. § 703 (providing that, generally, venue is proper in "a court of competent jurisdiction" for actions brought under the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 551–59).

## FACTUAL ALLEGATIONS

I.     **The BSA provides limited authority for the Treasury to require financial institutions to report "suspicious transactions."**

27.     The BSA is a federal law requiring financial institutions in the United States to

assist federal government agencies in detecting and preventing money laundering. *See* 31 U.S.C. §§ 5311–30. Among other things, the BSA requires certain financial institutions to maintain anti-money laundering ("AML") policies and policies designed to counter the financing of terrorism ("CFT") programs (together, "AML / CFT"). 31 U.S.C. § 5318(a)(2).

28.     Under the BSA, the Secretary of the Treasury is authorized to "require a class of domestic financial institutions or nonfinancial trades or businesses to maintain appropriate procedures, including the collection and reporting of certain information as the Secretary of the Treasury may prescribe by regulation, to ensure compliance with this subchapter and regulations prescribed under this subchapter or to guard against money laundering, the financing of terrorism, or other forms of illicit finance." *Id.*

29.     Pursuant to 31 U.S.C. § 5318(a)(1), the Secretary of the Treasury has delegated its authority "to implement, administer, and enforce compliance with the BSA" to the Director of FinCEN. 89 Fed. Reg. 70,258 n.5; *see also* Treas. Order No. 180–01(3)(a) (2014).

30.     The BSA definition of "financial institution" to which the Section 5318(a)(2) AML / CFT program requirement applies includes "persons involved in real estate closings and settlements." 31 U.S.C. § 5312(a)(2)(U). That definition does not include the private parties to a real estate transaction.

31.     To date, FinCEN has not subjected these persons to "comprehensive regulation under the BSA." *See* 89 Fed. Reg. 70,258.

32.     FinCEN purported to promulgate the Rule pursuant to the BSA, as amended by the Annunzio-Wylie Anti-Money Laundering Act, 31 U.S.C. § 5318(g)(1) (the "Anti-Money Laundering Act of 2020"). *See* 89 Fed. Reg. at 70,262.

33.     That provision, entitled "Reporting of Suspicious Transactions," authorizes the

Secretary to "require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any *suspicious* transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1) (emphasis added).

34.    The Anti-Money Laundering Act of 2020 amended the BSA to require the Secretary of the Treasury (and thus FinCEN) to "establish streamlined, including automated, processes to, as appropriate, permit the filing of noncomplex categories of reports." *Id.* § 5318(g)(5)(D)(i)(I). The streamlined reporting requirements adopted pursuant to the amended provisions must "reduce burdens imposed on persons required to report" while not "diminish[ing] the usefulness of the reporting to Federal law enforcement agencies, national security officials, and the intelligence community in combating financial crime, including the financing of terrorism." *Id.* § 5318(g)(5)(D)(i)(I)(aa)–(bb).

35.    In exercising its authority to adopt a streamlined SAR rule, FinCEN must comply with two requirements, which the BSA refers to as "Standards."

36.    Standard (I) mandates that in establishing a streamlined SAR process, FinCEN "shall establish standards to ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law (including regulations)." *Id.* § 5318(g)(5)(D)(ii)(I).

37.    Standard (II) provides that, in establishing such standards, FinCEN "shall consider transactions, including structured transactions, designed to evade any regulation promulgated under this subchapter, certain fund and asset transfers with little or no apparent economic or business purpose, transactions without lawful purposes, and any other transaction that the Secretary determines to be appropriate." *Id.* § 5318(g)(5)(D)(ii)(II).

**II.    Since 2016, and prior to the Rule, FinCEN limited reporting requirements geographically, monetarily, and temporally, among other things.**

38.    Instead of categorically targeting all "persons involved in real estate closings and

settlements," 89 Fed. Reg. 70,258. FinCEN historically has taken a more limited approach to reporting requirements, as required by statute. Starting in 2016, FinCEN used targeted Residential Real Estate Geographic Targeting Orders ("GTOs") to "require[] certain title insurance companies to file reports and maintain records concerning non-financed purchases of residential real estate above a specific price threshold by certain legal entities in select metropolitan areas of the United States." *Id*. at 70,259–60.

39.     The statute that authorizes FinCEN to use GTOs, 31 U.S.C. § 5326, imposes several restrictions on their use.

40.     As the name suggests, the GTOs are targeted, focusing on a subset of non-financed purchases of residential real estate that FinCEN believed presented a high risk of money laundering. 89 Fed. Reg. 70,259–60.

41.     GTOs are limited by geography, applying only in selected real estate markets. *Id*.

42.     GTOs are limited by a monetary threshold, applying only to sales involving consideration of at least $300,000, with one limited exception. *Id*. at 70,269 n.38.

43.     GTOs are limited in duration, applying for only 180 days, although they may be renewed. *Id*. at 70,259 n.14.

44.     Additionally, "[r]esidential real property purchases by transferee trusts have not generally been reported under the Residential Real Estate GTOs …." *Id*. at 70,281.

45.     The GTOs have defects of their own. For instance, GTOs also require unregulated persons to disclose BOI to regulated parties. But in promulgating GTOs, FinCEN expressly relied on a specific grant of statutory authority; FinCEN has not identified any similarly specific statutory grant for the Rule.

**III.    In August 2024, FinCEN issued the Rule, which will take effect in March 2026 and massively expand reporting requirements.**

    **A.    The Rule requires reporting persons to disclose substantial information regarding non-financed transactions, including beneficial ownership.**

46.    On February 16, 2024, FinCEN published a notice of proposed rulemaking proposing a nationwide and permanent regulatory scheme to require "consistent reporting of information" about what FinCEN characterized as "certain high-risk real estate transfers." *Id*. at 70,260. After a comment period, FinCEN adopted the proposed rule with some modifications in response to public comments. 89 C.F.R. § 70,258.

47.    On August 29, 2024, FinCEN issued the final Rule. 89 Fed. Reg. 70,258–94. Originally, the Rule's effective date was slated for December 1, 2025. *Id*. at 70,258. FinCEN has since postponed that effective date to March 1, 2026. *See* Press Release, *FinCEN Announces Postponement of Residential Real Estate Reporting Until March 1, 2026* (Sept. 30, 2025).

48.    Rather than citing a specific source of statutory authority (e.g., the source that authorized GTOs), FinCEN relied on its general rulemaking authority under the BSA.

49.    FinCEN asserts that the purpose of the Rule is "to assist the U.S. Department of the Treasury, law enforcement, and national security agencies in addressing illicit finance vulnerabilities in the U.S. residential real estate sector, and to curtail the ability of illicit actors to anonymously launder illicit proceeds through transfers of residential real property, which threatens U.S. economic and national security." 89 Fed. Reg. 70,258.

50.    As explained by FinCEN, the Rule "imposes a streamlined" SAR "filing requirement under which reporting persons, as defined, are required to file a 'Real Estate Report' on certain non-financed transfers of residential real property to legal entities and trusts." *Id.* The Rule purports to build on FinCEN's experience employing the GTOs to collect information on certain "high risk" residential real estate transactions. *Id*. at 70,259.

51.     In imposing these disclosure requirements, the Rule includes key definitions relating to the reporting requirement.

52.     **Reportable transfer**. The Rule defines "reportable transfer" to include any "non-financed transfer to a transferee entity or transferee trust of an ownership interest in residential real property," subject to the exceptions set forth in paragraph (b)(2) of the Rule. 31 C.F.R. § 1031.320(b).

53.     **Residential real property**. The Rule defines "residential real property" to mean: "(i) [r]eal property located in the United States containing a structure designed principally for occupancy by one to four families; (ii) [l]and located in the United States on which the transferee intends to build a structure designed principally for occupancy by one to four families; (iii) [a] unit designed principally for occupancy by one to four families within a structure on land located in the United States; or (iv) [s]hares in a cooperative housing corporation for which the underlying property is located in the United States." *Id.* § 1031.320(b)(1)(i)–(iv).

54.     **Non-financed transfer**. The term "non-financed transfer" refers to "a transfer that does not involve an extension of credit to all transferees that is: (i) [s]ecured by the transferred residential real property; and (ii) [e]xtended by a financial institution that has both an obligation to maintain an anti-money laundering program and an obligation to report suspicious transactions under this chapter." *Id*. § 1031.320(n)(5).

55.     **Limited exceptions**. The Rule contains limited exceptions for transactions that involve: (i) a "[g]rant, transfer, or revocation of an easement; (ii) [t]ransfer resulting from the death of an individual …; (iii) [t]ransfer incident to divorce or dissolution of a marriage or civil union; (iv) [t]ransfer to a bankruptcy estate; (v) [t]ransfer supervised by a court in the United States; (vi) [t]ransfer for no consideration made by an individual, either alone or with the individual's

spouse, to a trust of which that individual, that individual's spouse, or both of them, are the settlor(s) or grantor(s); (vii) [t]ransfer to a qualified intermediary for purposes of 26 C.F.R. § 1.1031(k)-1; or (viii) [t]ransfer for which there is no reporting person." 31 C.F.R. § 1031(b)(2)(i)–(viii).

56.     **Reporting person**. The "reporting person" for any transfer is "one of a small number of persons who play specified roles in the real estate closing and settlement, with the specific individual determined through a cascading approach," unless that "cascading" order is superseded by a designation "agreement among persons in the reporting cascade." 89 Fed. Reg. 70,258.

57.     **Reporting cascade**. The cascade runs as follows: "(1) the person listed as the closing or settlement agent on the closing or settlement statement for the transfer;[2] (2) the person that prepares the closing or settlement statement for the transfer; (3) the person that files with the recordation office the deed or other instrument that transfers ownership of the residential real property; (4) the person that underwrites an owner's title insurance policy … such as a title insurance company; (5) the person that disburses … the greatest amount of funds in connection with the residential real property transfer"; (6) the person that evaluates the status of the title; or (7) the person that prepares the deed or, if no deed is involved, any other legal instrument that transfers ownership of the residential real property. 31 C.F.R. § 1031(c)(1)–(7). FinCEN provides a description of the reporting cascade on its website.

---

[2] The Rule defines "closing or settlement agent" to mean "any person, whether or not acting as an agent for a title agent or company, a licensed attorney, real estate broker, or real estate salesperson, who for another and with or without a commission, fee, or other valuable consideration and with or without the intention or expectation of receiving a commission, fee, or other valuable consideration, directly or indirectly, provides closing or settlement services incident to the transfer of residential real property." 31 C.F.R. § 1031.320(n)(2).

**Figure 1**

| |
|---|
| 1. The person listed as the closing or settlement agent on the closing or settlement statement; |
| 2. If no person described above is involved, the person that prepares the closing or settlement statement; |
| 3. If no person described above is involved, the person that files with the recordation office the deed or other instrument that transfers ownership of the residential real property; |
| 4. If no person described above is involved, the person that underwrites an owner's title insurance policy for the transferee with respect to the transferred residential real property, such as a title insurance company; |
| 5. If no person described above is involved, the person that disburses in any form, including from an escrow account, trust account, or lawyers' trust account, the greatest amount of funds in connection with the residential real property transfer; |
| 6. If no person described above is involved, the person that provides an evaluation of the status of the title; or |
| 7. If no person described above is involved, the person that prepares the deed or, if no deed is involved, any other legal instrument that transfers ownership of the residential real property, including, with respect to shares in a cooperative housing corporation, the person who prepares the stock certificate. |

FinCEN, *Real Estate Reports: Frequently Asked Questions*.

58.    As can be seen above, the cascade sweeps in brokers and others regardless of whether they conduct closings, handle funds, or perform settlement functions.

59.    **Attorneys**. The Rule does not exempt attorneys from being reporting persons. *See* 89 Fed. Reg. at 70,262–63.

60.    **Transferee entities**. A "transferee entity" is defined as "any person other than a transferee trust or an individual," subject to an enumerated list of exceptions. 31 C.F.R. 1031.320(n)(10).

61.    There is no exception for domestic entities or for entities controlled by United States citizens. This is notable in light of FinCEN's recent acknowledgment that a similar rule

swept too broadly by including U.S. companies and U.S. persons in a beneficial ownership disclosure requirement. FinCEN amended that interim final rule to exclude those categories from its coverage. *See* Press Release, Fin. Crimes Enf't Network, *FinCEN Removes Beneficial Ownership Reporting Requirements for U.S. Companies and U.S. Persons, Sets New Deadlines for Foreign Companies* (Mar. 21, 2025), https://www.fincen.gov/news/news-releases/fincen-removes-beneficial-ownership-reporting-requirements-us-companies-and-us.

62.    For "transferee entities," the reporting person must report the entity's (A) legal name; (B) trade name or "doing business as" name; (C) current address; and (D) unique identifying number, such as an Internal Revenue Service Taxpayer Identification Number ("IRS TIN"). 31 C.F.R. § 1031.320(e)(1)(i).

63.    **Beneficial ownership of the transferee entity**. The reporting person also must provide the same information for each beneficial owner (above a percentage threshold) of the transferee entity, as well as the beneficial owner's date of birth and citizenship. *Id*. § 1031(e)(1)(ii). The Rule provides a complex, multi-part definition of "beneficial owner." 31 C.F.R. § 1031.320(n)(1). Generally, a beneficial owner "owns or controls at least 25 percent of the ownership interests" of the transferee entity. 31 C.F.R. 1010.380(d)(2)(iii) (incorporated into definition of beneficial owner, *see* 89 Fed. Reg. at 70,293).

64.    **Identifying information**. For each signing individual, the reporting person must provide their name, date of birth, address, and unique identifying number, as well as a description of the capacity in which the individual is authorized to act as the signing individual, and if the signing individual is acting as an employee, agent, or partner, the name of their employer, principal, or partnership. *Id*. § 1031.320(e)(1)(iii). Thus, an individual signing on behalf of an entity may be required to provide sensitive personal information despite not personally being party

to the transfer.

65. **Transferee trusts**. For transferee trusts, the reporting person must provide the trust's (A) legal name, such as the full title of the agreement establishing the transferee trust; (B) date the trust instrument was executed; (C) unique identifying number; and (D) whether the transferee trust is revocable. 31 C.F.R. § 1031.320(e)(2)(i). If a trustee is a legal entity, the report must include its legal name, trade name or "doing business as" name, address, and unique identifying number. *Id*. § 1031.320(e)(2)(ii).

66. **Beneficial ownership of the transferee trust**. For each beneficial owner of the trust, the reporting person must provide essentially the same information, as well as their date of birth, citizenship, and a statement of which "category of beneficial owner, as determined in paragraph (j)(1)(ii)" of the Rule the listed person belongs to. *Id*. § 1031.320(e)(2)(iii).

67. **Identifying information**. Reports on transferee trusts are also required to include the same information on signing individuals as reports about legal entity transferees. *Id*. § 1031.320(e)(2)(iv).

68. **Transferors**. In addition to these requirements for transferee legal entities and trusts, the Rule requires the reporting person to provide similar information about transferors, regardless of whether they are individuals, legal entities, or trusts. *Id.* § 1031.320(f).

69. **Property information**. The report must also include the address, a legal description, and the date of closing for the property. *Id*. § 1031.320(g).

70. **Consideration**. The reporting person must report the total consideration paid in the transaction, the method by which the payment was made, the name of any financial institution from which a payment was drawn, the name of the payor on any wire, check, or other payment, and any hard money or private loans involved in the transaction. *Id.* § 1031.320(h)–(i).

16

71.    **Reporting deadline**. The Rule obligates a "reporting person" to file the required report with FinCEN either by 30 days after the transfer or by the last day of the month following the transfer, whichever is later. *Id*. § 1031.320(a), (k)(3).

72.    **Reasonable reliance**. FinCEN incorporated a "reasonable reliance" standard into the Rule under which the reporting person may "rely upon information provided by other persons, absent knowledge of facts that would reasonably call into question the reliability of the information provided to the reporting person." 31 C.F.R. § 1031.320(j)(1). But for purposes of reporting BOI, the person providing the information must also "certif[y] the accuracy of the information in writing to the best of the person's knowledge" for the reporting person to rely on their representations for purposes of complying with the Rule. *Id.* § 1031.320(j)(2).

73.    FinCEN has indicated that a real estate report "shall include" more than 100 different categories of information. 89 Fed. Reg. at 70,291–94. Reporting persons will submit these reports electronically after the effective date of the Rule.

**Figure 2**



**B.**     **Departing from the more limited GTOs (and their specific and limited statutory basis), the Rule drastically expands reporting requirements.**

74.     Under the GTOs, the reporting obligations placed on those involved in real estate transactions were targeted and limited. *Id.* at 70,279.

75.     The GTOs are limited by geography: they cover limited markets (primarily major metropolitan areas) in 13 States and the District of Columbia. *Id*. at 70,259–60.

76.     The GTOs also are limited by monetary value: they cover only sales involving consideration of at least $300,000, with one limited exception for Baltimore, Maryland. *Id*. at 70,269 n.38.

77.     The GTOs are intended to be temporary. *Id*. at 70,259 n.14. They may be implemented for only 180 days, although they may be renewed. *Id*.

78.     The GTOs generally exclude transactions in which the purchasing entity is a trust. *Id*. at 70,281.

79.     As FinCEN noted, the "GTOs are narrow in that they are temporary, location-specific, and limited in the transactions they cover." *Id*. at 70,279. FinCEN used these limited GTOs "to collect information on a subset of transfers of residential real estate that FinCEN considers to present a high risk for money laundering." *Id*. at 70,259.

80.     Under the Rule, the reporting obligations on those involved in real estate transactions have been vastly expanded to include all sales in the United States and its territories that meet the Rule's broadened criteria. Many trusts also are now included in the reporting obligation. 89 Fed. Reg. at 70,269–70.

81.     As compared to the GTOs, the Rule will massively expand the number of reports required each year and the financial burden imposed on reporting persons and entities. In 2023, approximately 20,411 reports were made to FinCEN under the GTOs. By contrast, FinCEN

18

estimates "the number of reportable transfers [under the Rule] would be between approximately 800,000 and 850,000 annually." *Id*. at 70,283. FinCEN's estimate represents a 4,000% increase in reporting.

82.    The Rule will impact the privacy rights of individuals and entities. Settlement agents will now have to collect private and sensitive information not previously obtained in real estate closings. This includes personal identifiable information from trustees of family trusts and signers on behalf of legal business entities.

83.    The Rule requires the reporting person to retain for at least five years "a copy of any beneficial ownership certification form" and all parties to a designation agreement to retain a copy of that agreement for at least five years. *Id*. at 70,276. The beneficial ownership certification form will contain sensitive personal information about all beneficial owners regardless of minor age or other vulnerabilities.

### C.    The Rule surveils ordinary residential purchases and lawful privacy structures without individualized suspicion.

84.    FinCEN has acknowledged that the requirement to collect and report IRS TINS is "subject to heightened privacy concerns and that the collection of such information could entail cybersecurity and operational risks." 89 Fed. Reg. at 70,265.

85.    The Rule creates acute cybersecurity and privacy risks by conscripting small, ill-prepared settlement actors to collect, warehouse, and transmit highly sensitive BOI for at least five years—including data on minority stakeholders, minors, and legally incapacitated persons without any indicia of illicit conduct. The Constitution does not permit the federal government to deputize private intrastate businesses as long-term data custodians and compel the mass collection and retention of intimate personal information—absent suspicion, judicial oversight, or narrowly tailored safeguards—simply because some transactions could be abused.

19

86.    In identifying the Rule's benefits, FinCEN touted the Rule as enabling law enforcement to combat "two problematic phenomena": (i) the use of the residential real estate market to facilitate money laundering and illicit activity; and (ii) the difficulty of determining who beneficially owns legal entities or trusts that engage in non-financed transfers of residential real estate. 89 Fed. Reg. at 70,278 (describing this latter difficulty as arising "either because this data is not available to law enforcement or access is not sufficiently centralized to be meaningfully usable for purposes of market level risk-monitoring or swift investigation and prosecution"). But neither premise underlying the "two problematic phenomena" is correct.

87.    First, the premise that entities, trusts, or persons buy houses for illicit purposes treats a wholly ordinary act—purchasing a home—as an indicium of wrongdoing. Entities, trusts, or persons acquire residential property for innumerable legitimate reasons (residency, family needs, privacy, safety, asset protection, estate planning, philanthropy), none of which renders the transaction per se suspicious.

88.    Second, the claim that it is difficult to identify BOI for legal entities condemns a lawful design feature of entity law, not a bug: legislatures have long permitted the separation of ownership and public identity to facilitate privacy, risk allocation, and investment. None of these long recognized considerations are wrongful, let alone inherently illicit. Compelling BOI collection and years long retention without individualized suspicion converts ordinary home purchases and standard entity structuring into grounds for federal surveillance, exceeding statutory authority and violating constitutional limits.

89.    Regardless, BOI is not difficult to identify when it is appropriate to do so. When the government has a legitimate basis to investigate wrongdoing, including regarding beneficial ownership, the government can avail itself of narrowly tailored procedures for obtaining BOI. For

instance, when FinCEN has probable cause, it could seek a warrant for documents reflecting beneficial owner information—rather than the suspicionless nationwide dragnet imposed by the Rule. Similarly, when appropriate, law enforcement may employ constitutionally permissible means to target genuinely suspicious transactions, including through individualized subpoenas, judicial relief, and other established investigative tools. There is no need to burden parties to every residential conveyance—or to erode state-crafted privacy frameworks—with a suspicionless, BOI stockpiling regime.

90.    Lawful privacy interests do not create reasonable suspicion. Trusts and entities allow non-public titling for a host of legitimate ends, including estate planning, asset protection, family safety, and dignitary privacy. By treating such lawful purposes as suggesting wrongdoing, the Rule burdens lawful conduct absent individualized cause, displaces state policy choices, and circumvents long established targeted tools for the government to investigate and obtain BOI based only on tailored suspicion.

## IV.    The Rule requires retention of sensitive BOI for at least five years, making data breaches inevitable and subjecting BOI owners to threats and physical harm.

91.    The Rule also poses serious harm because it collects highly sensitive information and requires countless persons and entities to retain that data, all but guaranteeing data breaches and the dire consequences that result from such breaches.

92.    The Rule makes serious data breaches all but inevitable. It requires covered persons (including attorneys, notaries, and brokers) to retain their clients' most sensitive identifiers for at least five years. Those clients are natural person beneficial owners who rely on these professionals to structure lawful entities and transactions that protect privacy. Forcing advisers to request and warehouse this information all but ensures breach and unauthorized disclosure of this sensitive data.

93.     Compounding the risk of a data breach, the Rule does not require deletion of this highly sensitive information after the retention period ends. Less cautious or less technically savvy reporting persons, in addition to reporting persons who are not regularly subject to the Rule, may retain BOI information considerably longer, increasing the risk of unauthorized access. Even reporting persons who intend to delete the information after five years have passed may not have the technical expertise to truly delete all instances of the data in their systems. In other words, the sensitive BOI data will be subject to exposure for at least five years—and potentially, much longer.

94.     Further making this data exposure all but inevitable, the Rule requires this sensitive BOI information to be retained by tens of thousands (or more) persons and entities that are not equipped to safeguard it. For many reporting persons, the required systems and controls are not enterprise grade, making breaches a foregone conclusion. In the real world, BOI will leak the same ways that data normally leaks: a misaddressed email attaching the certification form; a phished account that exposes cloud drives; a ransomware attack on a local workstation; a lost or stolen laptop or portable storage device containing copies for the Rule's required retention; a misconfigured cloud folder open to the public; a vendor-side breach of an e-signature or document platform; insider misuse of files downloaded to personal devices; or countless other ways.

95.     Highly public prior breaches show both the inevitability of this data exposure and the severe consequences that flow from it. For instance, a former Internal Revenue Service ("IRS") contractor, Charles Edward Littlejohn, leaked private tax records in what has been called the largest known data breach in IRS history. In another example, in 2015, the United States Office of Personnel Management suffered a serious hacking incident. Threat actors exfiltrated investigation records for approximately 21.5 million individuals and about 5.6 million sets of fingerprints—highly sensitive data that, unlike passwords, cannot be "reissued." There is no reason to think that

FinCEN would be immune to a similar attack. If anything, FinCEN would be even more attractive to threat actors, who would target FinCEN, knowing that it would warehouse a treasure trove of sensitive data required by the Rule.

96.     If experience shows that more secure government systems can be compromised, then the workaday, less sophisticated systems maintained by the many settlement professionals subject to the Rule surely will be as well. Threat actors will attack, and inevitably breach, these soft targets.

97.     Once exposed, owners of BOI will be in the crosshairs of threat actors across the globe. Armed with this BOI, nefarious actors will weaponize this sensitive data in all the usual ways—doxxing private individuals, stealing their identities, extorting and blackmailing them, threatening physical harm, and subjecting them to violence. Simply put, the Rule collects (but cannot safeguard) highly sensitive information that functions as a Rosetta Stone for targeted identification.

98.     This Rosetta Stone effect, and its attendant harm, is particularly pronounced in Puerto Rico.

99.     First, Puerto Rico law and regulations already enable some forms of identity mapping. Public and quasi-public sources already enable significant cross-referencing in Puerto Rico real estate transactions, including decree recipient lists maintained by the Departamento de Desarrollo Económico y Comercio, the digital cadastral map (Portal Catastro Digital y Productos Cartográficos), and the property-title registry. When the Rule forces settlement actors to collect and retain BOI for at least five years, those additional identifiers operate as the missing link that turns these datasets into a precise map of a buyer's identity, residence, parcel, and transaction history.

100.    Second, Puerto Rico law offers tax incentives that have thrust many investors into a contentious public debate. The statutory framework—formerly Act 22 (2012), now integrated into Act 60 (2019)—offers incentives for investors who relocate and purchase a primary residence in Puerto Rico, subject to residency and philanthropic conditions. Many such purchasers lawfully use trusts or entities to hold title for estate planning, risk management, dignitary privacy, or safety provided by anonymity. Some individuals who are subject to Act 60's incentives purchase Puerto Rico residential property through trusts or other entities that anonymize beneficial ownership. Some individuals, including some members of the Association, may prefer to structure the transaction in this manner to maintain privacy, safety, and anonymity, particularly in light of the highly visible debate surrounding real estate purchases in Puerto Rico. Some individuals also may prefer to structure transactions this way to promote a broader investment strategy or for other tax purposes.

## V.    For these and other reasons, the Rule will cause injury to Plaintiffs.

101.    Under the Rule, a "reporting person" that fails to submit a complete and accurate report for a reportable transfer is exposed to civil and criminal penalties under the BSA—including substantial civil fines, potential imprisonment for willful violations, and enhanced penalties for patterns of negligent noncompliance in reporting. 89 Fed. Reg. at 70,264. FinCEN announced its intent "to conduct outreach to potential reporting persons on the need to comply with the [Rule's] requirements." *Id*.

102.    Plaintiffs will be injured by the Rule.

103.    **The Association will be injured by the Rule**. The Association consists of one or more members who will be injured by the Rule. One or more of the Association's members intend to engage in a "reportable transfer," including purchasing property in a transaction subject to the Rule—e.g., a "non-financed transfer to a transferee entity or transferee trust of an ownership

interest in residential real property." 31 C.F.R. § 1031.320(b). This reportable transfer involves "residential real property" as defined by the Rule. 31 C.F.R. § 1031.320(b)(1)(i)–(iv). This transaction is not subject to the limited exceptions provided by the Rule. *See* 31 C.F.R. § 1031.320(b)(2)(i)–(viii). The member would enjoy anonymity as the beneficial owner of the transferee entity or trust, but for the reporting obligations imposed by the Rule, which will destroy such anonymity (and the safety that comes with it) and require disclosure of sensitive personal information. *See* 31 C.F.R. § 1031.320.

104.    The member also would be injured by being compelled to disclose his or her information to a reporting person despite not being a "financial institution" that Congress has made subject to regulation by FinCEN.

105.    The Rule also chills the lawful use of privacy-protective ownership structures. By undermining the utility of trusts and entities that Puerto Rico purchasers routinely adopt for legitimate purposes, the Rule burdens both consumers and the Association's members with heightened security costs, liability exposure, and diminished client confidence.

106.    The Association also will be injured by the Rule because one or more of the Association's members is a notary under Puerto Rico law. Puerto Rico is a civil-law jurisdiction, and notaries are licensed attorneys who handle and authenticate key legal documents for property transactions. Among other things, a notary prepares a deed of sale (or *escritura de compraventa*), examines and verifies title, prepares other legal documents, records the title, and assists with other legal requirements for finalizing the sale. Notaries specialize in real estate transactions, including in Puerto Rico, and assist with real estate closing and settlement services and frequently facilitate the transfer of residential real property. Notarial services may be used to transfer residential real estate into legal entities or trusts. Notaries will be engaged in these same professional activities on

25

or after March 1, 2026. Under the Rule, a notary is a "reporting person." 31 C.F.R. § 1031.320. As a reporting person, the notary will be required to file a report with FinCEN every time the notary provides services for a client engaging in a reportable transfer. The notary will be required to disclose the beneficial owners of client entities and trusts. If the notary does not file the report within 30 days of a given transfer, or before the last day of the month following a given transfer, the notary will be subject to the Rule's penalties. 89 Fed. Reg. at 70,275.

107.    The Rule places Puerto Rico attorney–notaries in direct tension with their neutral public function, custody obligations, and professional duties—even when the notary is not counsel to any party and is acting as settlement agent. Puerto Rico notaries serve as impartial public officers under the supervision of the Puerto Rico Supreme Court and La Oficina de Inspección de Notarías ("ODIN"); their charge is to authenticate acts, preserve the integrity of the *protocolo*, and safeguard the parties' legal certainty—not to investigate clients or relay their personal data to law enforcement databases. The Rule compels the opposite. By requiring the notary to obtain, verify, and transmit BOI (including for trustees, minority holders, minors, and legally incapacitated persons) and to retain that data for at least five years, the Rule converts a neutral officer into a data-collection arm of law enforcement. That investigative posture is incompatible with the notary's duty of impartiality and the civil-law conception of the notary as a non-adversarial guarantor of legal certainty.

108.    Puerto Rico's notarial framework tightly regulates what resides in the *protocolo*, how it is conserved, and who may obtain copies. The Rule obligates extra protocol creation and warehousing of BOI certifications and designation agreements, expanding access and storage locations outside the ordinary notarial chain of custody. This risks violation of custody, conservation, and access norms enforced by ODIN and the Puerto Rico Supreme Court.

109.    By compelling brokers and other settlement professionals to act as long-term custodians of their clients' most sensitive identifiers for the benefit of distant enforcement and intelligence agencies, the Rule transforms cooperative, trust-based advisory relationships into quasi-adversarial ones. Clients will fear that information they provide for the limited purpose of closing a home purchase or structuring a lawful transaction will instead be warehoused for years, cross-referenced by agencies with unrelated mandates, and accessible to a shifting cast of government personnel. The inevitable result is a chilling effect on the lawful use of privacy-protective structures and a loss of confidence in the very intermediaries on whom they must rely.

110.    In sum, the Rule will harm many of the Association's members. It will require the disclosure of the sensitive personal information of one or more of its members, destroying their privacy and the safety that comes with it. And the Rule would conscript at least one member who is a Puerto Rico notary—a neutral guarantor of authenticity and legal certainty—into a long-term custodian and reporter of highly sensitive personal data, outside the *protocolo* and without Puerto Rican judicial oversight. The Court should enjoin application of the Rule.

111.    **The Trust will be injured by the Rule**. Under the Trust's organizing instrument, the Trust intends to serve as transferee of real property on or after March 1, 2026. That purchase will constitute a "reportable transfer," as the Trust will engage in a transaction subject to the Rule—e.g., a "non-financed transfer to a … transferee trust of an ownership interest in residential real property." 31 C.F.R. § 1031.320(b). This reportable transfer involves "residential real property" as defined by the Rule. 31 C.F.R. § 1031.320(b)(1)(i)–(iv). This transaction is not subject to the limited exceptions provided by the Rule. *See* 31 C.F.R. § 1031.320(b)(2)(i)–(viii). One of the Trust's stated purposes is to maintain and protect the anonymity of its beneficiaries. The beneficial owners of the transferee Trust would enjoy anonymity, but for the reporting

obligations imposed by the Rule, which will destroy such anonymity and require disclosure of beneficial ownership and sensitive personal information. *See* 31 C.F.R. § 1031.320. The Trustee seeks to protect and vindicate these rights.

## CLAIMS FOR RELIEF

### Count One: Violation of 5 U.S.C. § 706
### The Rule Exceeds FinCEN's Statutory Authority

112.   Plaintiffs reallege and incorporate paragraphs 1 through 111 of their complaint as if fully set forth and restated herein.

113.   The APA requires courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," among other things. 5 U.S.C. § 706(2)(C).

114.   The Rule exceeds FinCEN's statutory authority because: (A) it is not limited to transactions that are both "suspicious" and "relevant to a possible violation of law or regulation," as required under 31 U.S.C. § 5318(g)(1); (B) the Rule fails to comply with streamlined SAR standards, as set forth in 31 U.S.C. § 5318(g)(5)(D)(i)(I); and (C) FinCEN, having premised the Rule on Section 5318(g)(1), cannot point to a fallback statutory provision (e.g., 31 U.S.C. § 5318(a)(2)), as authorizing the Rule.

A.   **The Rule exceeds FinCEN's authority under 31 U.S.C. § 5318(g) because it is not limited to transactions that are both "suspicious" and "relevant to a possible violation of law or regulation."**

115.   The Rule exceeds FinCEN's statutory authority to impose reporting requirements on financial institutions. FinCEN relied on Section 5318(g)(1) to promulgate the Rule. *See* 89 Fed. Reg. at 70,262 (Aug. 29, 2024) ("FinCEN is issuing this final rule pursuant to its BSA authority to require 'financial institutions' to report 'suspicious transactions' under 31 U.S.C. 5318(g)(1)."). Section 5318(g)(1) authorizes the Secretary to impose SAR reporting duties by adopting rules that

"require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1).

116.    Section 5318(g)(1) does not authorize the Rule. By its plain terms, Section 5318(g)(1) allows the Secretary (and thus FinCEN) to impose SAR requirements only on transactions that are both "suspicious" and "relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). In other words, unless both of these requirements are satisfied by each transaction made reportable by a FinCEN SAR rule, the rule necessarily exceeds the scope of authority delegated to FinCEN under Section 5318(g)(1).

117.    Here, the Rule does not satisfy these requirements; it does not limit itself to transactions that are "suspicious" or connected with a "possible violation of law or regulation." *Id*. Instead, the Rule imposes a categorical reporting requirement under which financial institutions must report virtually all non-financed residential real estate transfers to legal entities or trusts, with a few limited exceptions. The Rule does not require that reporting persons have any particularized basis for believing that a transaction is "suspicious." Likewise, the Rule does not require the reporting person to have any reason to believe that any given transaction is connected with a potential violation of a legal or regulatory duty. Transferring property to a trust or legal entity without obtaining financing is not illegal or inherently suspicious and such transactions do not necessarily involve any connection with legal or regulatory violations.

118.    FinCEN has never claimed that all (or even most) of the 800,000 to 850,000 transactions that must be reported annually pursuant to the Rule are likely connected with illegal activity. *See* 89 Fed. Reg. at 70,283. In fact, FinCEN's own findings as to the predecessor GTOs show that the Rule is overinclusive. FinCEN found that "from 2017 to early 2024, approximately

42 percent of non-financed real estate transfers captured by the Residential Real Estate GTOs were conducted by individuals or legal entities on which a SAR has been filed." *Id.* at 70,260.

119.    In other words, most of the transactions that FinCEN evaluated regarding GTOs—a much more limited program than is contemplated by the Rule—had no apparent connection with any potential legal or regulatory violation. The new Rule is broader (including by sweeping in most trusts) and less targeted, all but ensuring that the Rule will be even more overinclusive as compared to the GTOs (i.e., the Rule will sweep up an even greater share of lawful transactions).

120.    Because the Rule regulates transactions that are neither suspicious nor connected with potential legal or regulatory violations, the Rule exceeds FinCEN's statutory authority to require a SAR filing pursuant to Section 5318(g)(1).

121.    Additionally, the Rule effectively requires parties to a covered transaction to disclose to reporting persons information that they would not otherwise disclose in the ordinary course of business. The Rule therefore regulates parties that are not "financial institutions," exceeding FinCEN's statutory authority.

**B.    The Rule exceeds FinCEN's authority because it violates streamlined SAR requirements.**

122.    The Rule also exceeds FinCEN's statutory authority because it violates the streamlined SAR standards.

123.    FinCEN asserted that the Rule institutes a SAR "filing requirement" pursuant to FinCEN's authority under 31 U.S.C. § 5318(g)(5)(D). 89 Fed. Reg. at 70,262. Thus, the Rule must comply with the streamlined SAR standards.

124.    But SARs are only permissible for "noncomplex categories of reports." 31 U.S.C. § 5318(g)(5)(D)(i)(I). The reports required under the Rule are highly complex, including 111 fields.

125.    And FinCEN made no attempt to comply with Standard (I), which requires that streamlined SAR standards must "ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law." 31 U.S.C. § 5318(g)(5)(D)(ii)(I).

126.    Standard (I) imposes a mandatory duty on FinCEN to ensure that transactions made reportable by a streamlined SAR rule are both suspicious and related to a potential violation of law or regulation. The Standard explicitly requires that FinCEN "shall establish standards to ensure that streamlined reports relate to suspicious transactions relevant to potential violations of law," 31 U.S.C. § 5318(g)(5)(D)(ii)(I). This means the Secretary and FinCEN may adopt a streamlined SAR rule only if that rule is tailored so that it regulates only transactions that are both suspicious and "relevant to potential violations of law." *See id.*

127.    The Rule is not designed to ensure that reportable transactions are suspicious and relevant to potential legal or regulatory violations. The Rule imposes a categorical requirement that necessarily includes a substantial number of transactions that do not exhibit any particular indicia of illegality or a nexus with any potential violation of law or regulation.

**C.    FinCEN cannot point to a fallback provision, such as Section 5318(a)(2), as authorizing the Rule.**

128.    Given FinCEN's self-professed basis (i.e., Section 5318(g)(1)) for issuing the Rule, FinCEN cannot resort to grounding the Rule in another statutory provision.

129.    For instance, FinCEN references Section 5318(a)(2) in a footnote, but that fails to provide the requisite authority for the Rule. 89 Fed. Reg. at 70,259 n.11.

130.    Besides this fleeting reference, FinCEN never offered any substantive explanation concerning how that provision authorizes the Rule and expressly relied on Section 5318(g)(1) instead.

131.    In any event, by its terms, Section 5318(a)(2) authorizes the Secretary and FinCEN

to adopt only rules that require financial institutions "to maintain appropriate procedures, including the collection and reporting of certain information as the Secretary of the Treasury may prescribe by regulation, to ensure compliance with this subchapter and regulations prescribed under this subchapter or to guard against money laundering, the financing of terrorism, or other forms of illicit finance." 31 U.S.C. § 5318(a)(2). Section 5318(a)(2) does not authorize the Secretary and FinCEN to adopt substantive reporting requirements like that imposed by the Rule.

132.    FinCEN also cannot ground the Rule in Section 5318(a)(2) because it cannot rely on its general authority to make rules necessary to carry out its general functions when a specific statutory directive defines the relevant functions. Here, two provisions of the BSA—Section 5318(g) and Section 5318(n)—expressly authorize the Treasury Secretary and FinCEN to impose reporting requirements on financial institutions. In both provisions, Congress has defined a specific statutory standard that reporting rules must satisfy. Section 5318(g)(1) expressly limits FinCEN's authority to impose SAR reporting requirements to transactions that are both "suspicious" and "relevant to a possible violation of law or regulation." Section 5318(n) similarly allows FinCEN to adopt rules requiring financial institutions to report cross-border transmittals of funds only when "reasonably necessary" to combat "money laundering and terrorist financing." 31 U.S.C. § 5318(n)(1). FinCEN cannot ground the Rule in the general provision of Section 5318(a)(2), as that would effectively override the specific limitations of Sections 5318(g) and 5318(n).

133.    Interpreting Section 5318(a)(2) as authorizing FinCEN to impose substantive reporting requirements would violate the non-delegation doctrine. That is, if Section 5318(a)(2) independently authorizes FinCEN to require "collection and reporting" of information, it provides no intelligible principle for what information FinCEN may require to be collected and reported. FinCEN could conceivably require financial institutions to report any "information" the Secretary

desires. This total absence of guidance would violate Article I and separation-of-powers principles.

134.    FinCEN's lack of statutory authority—and inability to rely on the general grant of authority of Section 5318(a)(2)—is illustrated by the statutory history of the predecessor GTOs. After Congress enacted Section 5318(g) and Section 5318(a)(2) of the BSA, Congress enacted the statute providing for the Secretary of the Treasury to designate targeted GTOs. 31 U.S.C. § 5326. If Section 5318(g) or 5318(a)(2) authorized the Rule, Congress would have had no need to enact the statute providing for the far more limited GTOs. By providing specific statutory authority for the GTOs, Congress indicated that more general provisions (e.g., 5318(g) and 5318(a)(2)) did not statutorily authorize the sweeping reporting requirements of the Rule.

135.    Finally, the Rule exceeds FinCEN's statutory authority because it applies to persons outside the definition of "financial institutions." Congress wrote the BSA to reach some non-banks, but the statute's breadth has limits: it targets actors who perform financial-institution functions, including "persons involved in closings and settlements," not every residential real estate intermediary. 31 U.S.C. § 5312(a)(2)(U). The Rule leaps beyond that line by sweeping in brokers and others regardless of whether they conduct closings, handle funds, or perform settlement functions—an overreach the statute does not authorize.

136.    For these reasons, the Rule is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of 5 U.S.C. §§ 706(2)(A) and 706(2)(C). Thus, the Court should hold the Rule unlawful and set aside and vacate the Rule.

### Count Two: Violation of U.S. Const. amend. IV and 5 U.S.C. § 706
### The Rule Violates the Fourth Amendment Prohibition Against Warrantless Searches

137.    Plaintiffs reallege and incorporate paragraphs 1 through 136 of their complaint as if fully set forth and restated herein.

138.    The APA requires courts to "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity," among other things. 5 U.S.C. § 706(2)(B).

139.    The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures" of "persons, houses, papers, and effects." U.S. Const. amend. IV.

140.    The Fourth Amendment operates particularly strongly in criminal investigation and law-enforcement contexts.

141.    FinCEN is a law-enforcement agency.

142.    "[F]acilitating law enforcement investigations into" reported transfers is one of the explicit purposes of the Rule. 89 Fed. Reg. at 70,259.

143.    Business records are "papers" within the meaning of the Fourth Amendment. The Rule's reporting requirement effects warrantless, physical, trespassory searches by requiring the production, to FinCEN, of papers containing information that the agency compels reporting persons to gather and persons, trusts, and entities to provide.

144.    No legal doctrine transforms this compelled transfer of private information directly to a law enforcement agency through papers into a non-search.

145.    The Rule requires Plaintiffs, including nominally unregulated private parties, to provide or collect information that is not provided voluntarily.

146.    The Rule requires Plaintiffs to provide or collect information that is not otherwise shared in the ordinary course of business.

147.    No judicially recognized warrant exception renders reasonable the Rule's compelled and warrantless searches.

148.    The Rule compels Plaintiffs' participation in FinCEN's trespassory searches of

their papers and the Trust's beneficiary's papers in violation of the Fourth Amendment. The Rule compels similarly situated persons and entities to participate in FinCEN's trespassory searches of their papers in violation of the Fourth Amendment.

149.    The Rule will injure Plaintiffs, including by injuring, or compelling the Trust to injure, the Trust's beneficiary, and cause them imminent and irreparable harm.

150.    The Rule is contrary to the U.S. Constitution's Fourth Amendment within the meaning of 5 U.S.C. § 706(2)(B).

151.    For these reasons, the Court should hold the Rule unlawful and set aside and vacate the Rule. Plaintiffs also are entitled to a declaration, pursuant to 28 U.S.C. § 2201, that FinCEN cannot enforce the Rule against Plaintiffs because such enforcement would violate the Fourth Amendment to the U.S. Constitution, both facially and as applied to Plaintiffs.

## REQUEST FOR RELIEF

For these reasons, Plaintiffs respectfully request that the Court enter judgment:

a.    Declaring, ordering, and adjudging that the Rule exceeds the statutory authority on which it purports to be based and thus is invalid and unenforceable;

b.    Declaring, ordering, and adjudging that the Rule is unconstitutional in that it violates the Fourth Amendment;

c.    Based on the foregoing, vacating and setting aside the Rule;

d.    Enjoining Defendants from enforcing the Rule against the Plaintiffs or from assisting any other federal agency in doing the same;

e.    Awarding Plaintiffs their costs and attorneys' fees; and

f.    Granting Plaintiffs any other relief that the Court deems just and proper.

February 25, 2026                     Respectfully submitted,

                                      *s/ Yalís De Jesús-Arocho*
                                      Marisara Meléndez-Torres (USDC-PR No. 303903)
                                        mmelendez@blolex.com
                                      Yalís De Jesús-Arocho (USDC-PR No. 302802)
                                        ydejesus@blolex.com
                                      Roberto Blanes-Ibarra (USDC-PR No. 231608)
                                        rblanes@blolex.com
                                      **BLOCK LEGAL LLC**
                                      270 Muñoz Rivera Avenue, Suite 350
                                      San Juan, Puerto Rico 00918
                                      Tel: (787) 705-8162

                                      Jonathan M. Albano (*pro hac vice* forthcoming)
                                        jonathan.albano@morganlewis.com
                                      Siobhan E. Mee (*pro hac vice* forthcoming)
                                        siobhan.mee@morganlewis.com
                                      Andrew M. Buttaro (*pro hac vice* forthcoming)
                                        andrew.buttaro@morganlewis.com
                                      Caroline C. Gillette (*pro hac vice* forthcoming)
                                        caroline.gillette@morganlewis.com
                                      **MORGAN, LEWIS & BOCKIUS LLP**
                                      One Federal Street
                                      Boston, Massachusetts 02110-1726
                                      Tel.: (617) 341-7700
                                      Fax: (617) 341-7701

                                      *Counsel for Plaintiffs*